Anthony **VALENTI** and Henrietta **Valenti, h/w, Plaintiffs**

v.

**ALLSTATE INSURANCE CO., Defendant**

No. CIV.A. 3:99–1234.

United States District Court, M.D. Pennsylvania.

Jan. 27, 2003.

Conrad A. Falvello, Sugarloaf, PA, John D. Nardone, Kingston, PA, for Plaintiffs.

Bonnie S. Stein, Robert G. LaBar, Curtin & Heefner, Morrisville, PA, Joel Steinman, Doylestown, PA, for Defendants.

### *MEMORANDUM AND ORDER*

MANNION, United States Magistrate Judge.

This case was initiated by a complaint filed in the Court of Common Pleas of Luzerne County on May 25, 1999. The defendant filed a petition for removal of the action from state court to federal court based upon diversity of citizenship. (Doc. No. 1) After an agreed to dismissal of certain counts, the defendant filed an answer on September 17, 1999. (Doc. No. 11) The matter, by consent of the parties, was assigned to United States Magistrate Judge Raymond J. Durkin on September 21, 1999. (Doc. No. 12)

This action arose out of a fire that occurred on January 20, 1999 at 25–26 Pugh Street, Edwardsville, Pennsylvania. The plaintiffs, Anthony and Henrietta Valenti, were the owners of a rental property located at the above-mentioned address. They were insured by the Allstate Insurance Company for fire damage under Insurance Policy No. 098095949. The policy was in effect on the date of the fire which destroyed the building. Following the fire, the plaintiffs submitted a claim for property damage to the Allstate Insurance Company. Allstate denied the claim.

The fire was an arson, a fact not disputed by any of the parties. The defendant, however, claimed that Anthony Valenti was responsible for an intentional act of arson on the property. Therefore, pursuant to an exclusion in the policy, Allstate claimed that plaintiffs were not entitled to any compensation under its policy. Further, the defendant alleged that the plaintiffs made false and fraudulent representations in the presentation of their claim to Allstate.

Before the court at the time of trial was the plaintiffs' claim for breach of contract and Allstate's counter-claim for insurance fraud.[1] The jury found in favor of Allstate on both claims. (Doc. No. 38) Allstate's insurance fraud claim was brought pursuant to 18 Pa.C.S.A. § 4117(a)(2) alleging that the plaintiffs knowingly and with intent to defraud, presented or caused to present a claim that was false concerning the material matters therein. Since the jury found in favor of Allstate (Doc. No.

---

1. The plaintiff voluntarily withdrew the Bad Faith claim against Allstate on the eve of the trial.

38), Allstate has requested compensatory damages to include reasonable investigation expenses, costs of suit and attorney's fees pursuant to the provisions of 18 Pa. C.S.A. § 4117(g). All parties agreed and stipulated that treble damages, which may be imposed if the defendant has engaged in a "pattern of violating this section" does not apply. The formal Judgment in this matter has been held in abeyance, pending the court's decision on the plaintiffs' post-trial motions and defendant's request for expenses, costs and fees. (Doc. Nos. 62 and 63)

On January 14, 2002, the defendant Allstate Insurance Company submitted an itemized bill of costs totaling $83,900.85. (Doc. No. 64) The plaintiffs filed a one paragraph response on January 17, 2002 in which they opposed and disputed Allstate's claim of itemization of costs. (Doc. No. 65) As a result, the court scheduled a hearing for April 1, 2002.

Prior to that time, the court had held a telephone conference with counsel for the parties concerning the evidence that would be presented at the hearing. This followed an unsuccessful settlement conference between counsel. The court directed Allstate to supply a more comprehensive and particularized statement of the expenses, costs and fees demanded. In this regard, on March 27, 2002, the defendant submitted a more complete itemization of the expenses, cost and fees, together with a privilege log identifying the portions of the billing documents that were not turned over to the plaintiffs and were alleged by the defendant to be privileged material. (Doc. No.77)

On April 1, 2002, this court held a lengthy hearing. Attending were counsel for the plaintiffs, counsel for Allstate, and the adjustor in charge of this case. Testimony by the adjustor and argument by counsel were made as the court reviewed, *line by line,* all objections made by the plaintiffs' counsel, together with responding arguments by defendant's counsel. The court also received, for the first time, an unredacted copy of the billing statements.[2]

In its motion, Allstate requests fees for a total of ten (10) attorneys, five (5) legal assistants, and one (1) investigator. The Curtin & Heefner, LLP law firm of Morrisville, Pennsylvania (hereinafter "Curtin") claims fees for partners Bonnie S. Stein, Allan D. Goulding, and Steven M. Harrington; associates, Joel Steinman, Robert G. Labar, Joseph W. Cunningham and Yolanda K. DeSipio; and, legal assistants, Mary E. Andujar, Joanne T. Boardman, and Mary Alice Heuman. The law firm of Dugan, Brinkmann, Maginnis & Pace of Philadelphia, Pennsylvania (hereinafter "Brinkmann") claim fees for partner John D. Brinkmann; associates Susan M. Danielski and Emily I. Remphrey; legal assistants Steven J. Payne and Nicole Chaykin. Finally, the investigative firms of Willox, Kerins & Associates of Horsham, Pennsylvania, as well as the investigative firm of Cloud, Feehry and Richter of West Chester, Pennsylvania (hereinafter "Cloud") claim fees for Thomas A. Cloud, the investigator used by Allstate and the law firms in this action [3].

---

2. While the court is describing it as "unredacted", there were certain portions of the "unredacted" billing statement which were still redacted in the court's copy. Those billing entries, for which the court is unable to actually determine what is alleged to have been done, will be excluded from the award given to the defendant.

3. Thomas A. Cloud, the investigator in this case, initially was employed by Willox, Kerins & Associates. At some point he left Willox to open his own firm and took this case with him.

The billing entries in this case are voluminous and span a period from February 2, 1999 through December 31, 2001. The privilege log alone contains over 100 purportedly privileged entries.

The plaintiffs raise numerous objections to the defendant's request for expenses, costs and fees. Those objections can be broken down into the following categories: (1) the reasonableness of the rates charged by the Curtin and Brinkmann firms for partner time considering they are from the Philadelphia area and therefore, bill at a higher rate than comparable counsel in the Scranton/Wilkes–Barre area;[4] (2) the reasonableness of the hours expended by Curtin and Brinkmann in performing tasks related to representation of the defendant; (3) the travel time and expenses associated with counsel and an investigator from the southeast portion of the state, when the action was in the northeast section of the state; and (4) a general objection to all redacted information from the billing statements, as plaintiffs' counsel states he is unable to make appropriate arguments to the court concerning its reasonableness, as he has not been supplied with the itemized entries.

### I. ATTORNEY'S FEES

Generally speaking, in a case involving claimed attorney's fees, the courts have relied upon the "lodestar" formula. In order to calculate the lodestar, one multiplies the number of hours reasonably expended by a reasonable hourly rate. *Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir.2001)(citing *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).

■ The party seeking attorney's fees must establish the reasonableness of its fee request by submitting evidence of the

hours worked and the hourly rate charged. *Rode v. Dellarciprete*, 892 F.2d 1177 (3d Cir.1990). "When the applicant for a fee has carried his burden of showing that the claimed rates and numbers of hours are reasonable, the resulting product is presumed to be the reasonable fee to which counsel is entitled." *Maldonado*, 256 F.3d at 184 (citing *Delaware Valley Citizens' Council*, 478 U.S. 546, 564, 106 S.Ct. 3088, 92 L.Ed.2d 439(1986)). The "party opposing the fee award, then has the burden to challenge, by affidavit or brief, with sufficient specificity, to give fee applicants notice, the reasonableness of the requested fee." *Rode*, 892 F.2d at 1183 (citing *Bell v. United Princeton Properties, Inc.*, 884 F.2d 713 (3d Cir.1989)). When determining a reasonable hourly rate in any particular case, the usual starting point for the court is the attorney's own normal billing rate. However, this is only a starting point and is not, in and of itself, dispositive. *See Public Interest Research Group of New Jersey, Inc. v. Windall*, 51 F.3d 1179, 1185 (3d Cir.1995).

■ In addition to ascertaining what the attorney's usual billing rate is, the court "should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Maldonado*, 256 F.3d at 184 (citing *Rode v. Dellarciprete*, 892 F.2d at 1183). The prevailing party "bears the burden of establishing by way of satisfactory evidence, in addition to (the) the attorney's own affidavits' . . . that the requested hourly rate meets this standard." *Maldonado, Id.* at 184 (citing *Washington v. Philadelphia County Court of Common Pleas*, 89 F.3d 1031, 1035 (3d

---

4. The plaintiff does not challenge the associate or legal assistant rate billed by those

firms.

Cir.1996))(citing *Blum v. Stenson*, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)).

Since plaintiffs have indicated, at oral argument, that they are not challenging the reasonableness of rates for associates, legal assistants or the investigator, the court will only address the rates billed by the partners at Curtin and Brinkmann. Lead counsel from Curtin, Bonnie S. Stein, billed at two (2) different rates. Prior to March 1, 2000, her billing rate was $135.00 per hour; after March 1, 2000, her billing rate was $150.00 per hour. Allan D. Goulding, also of Curtin, only billed after March 1, 2000, and billed at $150.00 per hour. Similarly, Steven M. Harrington only billed after March 1, 2000, and he also billed at $150.00 per hour. John D. Brinkmann, of the Brinkmann firm, always billed at $125.00 per hour

### Relevant Community

■ The plaintiff argues that the fees charged are not reasonable fees for the prevailing market rate in the relevant community. In this regard, the plaintiffs define the "relevant community" as the Scranton/Wilkes–Barre/Northeastern Pennsylvania area (hereinafter NEPA). Plaintiffs further argue that there are competent counsel in the NEPA area who could have represented Allstate and would have charged a lesser fee. At oral argument, counsel claimed that NEPA fees for insurance defense cases range from $90.00 to $110.00 per hour. It is noteworthy however, that counsel has failed to file any affidavits, documentation or evidence to support the claim that $90.00 to $110.00 per hour is the prevailing market rate in the NEPA area. In addition, counsel conceded at oral argument that the $90.00 to $110.00 rate is for usual first and third party representation of insurance companies by defense firms, rather than for "bad faith" defense.

The defendant's counsel, on the other hand, emphasized that this matter included a "bad faith" claim, which potentially subjected Allstate to punitive damages, under Pennsylvania law. As such, Allstate chose more experienced counsel, who specialize in the defense of bad faith claims. Additionally, this case involved a cross-claim for insurance fraud, not a usual action taken by an insurance company.

In deciding the definition of "relevant community", the Third Circuit has "never authoritatively resolved the issue" of whether the relevant community is the law firm's community or whether it is the community in which the case is actually litigated. *Public Interest Research Group of New Jersey, Inc. v. Windall*, 51 F.3d 1179, 1185–86 (3d Cir.1995). In *Public Interest Research Group of New Jersey*, the court noted that it had established a task force in 1986 to resolve this particular issue. As part of the task force report, it stated:

> In establishing a standardized fee schedule, the court will encounter the problem of selecting hourly rates for visiting lawyers from other parts of the country litigating in its forum. The task force reviewed the current practices of the various circuits and concluded that the best rule is the "forum rate" rule. Hence, an out of town lawyer would receive not the hourly rate prescribed by his district, but rather the hourly rate prevailing in the forum in which the litigation is lodged. Deviation from this rule should be permitted only when the need for "the special expertise of counsel from a distant district" is shown or when local counsel are unwilling to handle the case.

*Id.* at 1186.

While this language is instructive for lawyers visiting from other parts of the country, it is still difficult to apply with

respect to the Northeastern and Southeastern parts of Pennsylvania.

This court is concerned that plaintiffs' geographical argument artificially places boundaries on the Northeastern section of the state. It has been the experience of this court that counsel from the Eastern District of Pennsylvania (often referred to as "Philadelphia firms"[5]), the Western District of Pennsylvania, the District of New Jersey and the Eastern, Southern and Northern Districts of New York, often practice in the federal courts in the Middle District of Pennsylvania.

During oral argument, the Allstate adjustor in charge of this case testified under oath that Allstate only uses a very select group of law firms for "bad faith" claims. None of those firms are located in Northeastern Pennsylvania. Allstate apparently chooses the firms who handle bad faith claims based upon their expertise in this specific area of the law. This evolves from the increased exposure to Allstate made by the possibility of punitive damages under the Pennsylvania statute. The adjustor testified that aside from the Curtin firm, she was aware of only one firm in Pittsburgh and one in West Virginia that she has used in bad faith claims. Finally, the adjustor testified that she was unaware of any firm in Northeastern Pennsylvania which specialized or practiced in the bad faith area.

Based upon the testimony at trial and the argument of counsel at the hearing, the court finds that the Curtin firm, and specifically Bonnie S. Stein, had a special expertise in the area of bad faith defense. It was therefore appropriate and rational for Allstate to retain the services of counsel who were experienced in these cases and had handled similar matters, on behalf of Allstate, in the past.

Based upon the evidence presented by the defendant, and the lack of contrary evidence offered by the plaintiffs, the court finds that the selection of the firms used by the defendant were appropriate. Further, in light of this court's experience in often seeing counsel from the Eastern District of Pennsylvania practicing in both federal and local courts within the Middle District of Pennsylvania, the court believes that the "relevant community" for the purpose of determining billing rates in this bad faith claim includes not only Northeastern Pennsylvania, but at least, the entire Middle District and Eastern District of Pennsylvania.

The court also finds that this is consistent with the Third Circuit's evaluation of "relevant community" in *Public Interest Research Group of New Jersey*, 51 F.3d 1179 (3d Cir.1995)(The court found a lack of evidence in the record to differentiate or set geographic boundaries between the Southern New Jersey market for legal services and the entire district of New Jersey as the relevant market for legal services.)

Having determined that the "relevant community" includes the area within which the defendant's counsel are located, the court now turns to the prevailing market rates in the relevant community to determine if the hourly rates billed by counsel for both the Curtin and Brinkmann firms were "reasonable and standard."

### Reasonableness of Attorneys Rates

At oral argument, counsel for the defendant advised the court that prior to

---

5. The term "Philadelphia firm" is often used in the Middle District of Pennsylvania to express a belief that counsel's billing rates are higher, reflecting greater overhead and expense. In this case, it is noteworthy that the Curtin firm is located in Morrisville, Pennsylvania and, arguably, is not a "Philadelphia firm" for purposes of billing. Interestingly, however, the Brinkmann firm, which is located in downtown Philadelphia, charged a lesser rate than the Curtin firm, which, as mentioned, is located outside of Philadelphia.

March 1, 2000, the Curtin firm charged a rate of $135.00 per hour for all defense representation of Allstate Insurance Co., including first party, third party and bad faith claim defense. On March 1, 2000, by agreement with Allstate and the Curtin firm, Curtin raised its rates to $150.00 per hour for bad faith defense work. All other defense work remained at $135.00 per hour. This $15.00 per hour increase was also reflected in the billing rates of associates, increasing from $120.00 to $135.00 per hour, when engaged in a bad faith claim. This increased rate, according to counsel, reflected the increased risk of loss to Allstate as a result of the potential for punitive damages, and the corresponding heightened expertise of counsel necessary to successfully defend these actions. There is no evidence in this record that the increase related, in any way, to this particular case, rather it was an across the board determination by Allstate and their law firm regarding all bad faith actions.[6]

In support of its claim of the reasonableness of its fees, the defendant has provided the court with four (4) affidavits attesting to the accuracy and reasonableness of the fees charged. (Doc. No. 69, Exs.A–D) The first affidavit is from Nancy Rosen, the Allstate adjustor responsible for this case. Her affidavit, in pertinent part, states that she had reviewed all of the itemized costs and exhibits and is familiar with the facts of the case. She states that those costs were appropriate and necessarily incurred in the course of defending Allstate in the Valenti action. (Doc. No. 69, Ex. A)

The second affidavit produced by the defendant is from Attorney Martin J. Core, who is a partner with the law firm of Core, Stevens and Fenningham, P.C. Mr. Core states that he has represented insur-

ance companies in Pennsylvania for the last 37 years and is knowledgeable concerning the prevailing market rates for legal services rendered by law firms which handle insurance defense litigation cases. Additionally, he indicates that he is acquainted with the invoices prepared by Curtin and Brinkmann and believes their rates "are within the prevailing market rates in the community and as such they are standard and reasonable." (Doc. No. 69, Ex. B)

The third affidavit supplied by the defendant is from Attorney Frank S. Guarreri, the managing partner at the Curtin firm. He states that the rates at Curtin are calculated in accord with the prevailing market rates in the community and that the normal hourly rate of partners such as Bonnie S. Stein and Allan Goulding at the Curtin firm are $210.00 per hour. The regular hourly rate of Robert Labar, an associate at the firm, is $160.00 per hour and that the regular rate for legal assistants at the firm is $75.00 per hour. Because Allstate is a major client of Curtin, they are charged "a discounted hourly rate for the legal work performed by Curtin and Heefner." He also indicates that he is familiar with the rates Curtin and other firms charge for defense of bad faith issues. According to Mr. Guarreri, Curtin's rates are "standard and reasonable." (Doc. No. 69, Ex. C).

The fourth affidavit supplied by the defendant is from Attorney John W. Cunningham. Mr. Cunningham is presently associated with the Curtin firm and had previously been employed in the litigation department of Schubert, Bellwoar, Cahill and Quinn, P.C. of Philadelphia, for three (3) years. Prior to his employment at

---

6. It should again be noted that the commensurate increase in associates' billing rates in bad faith claims is not in dispute by the plaintiffs. They only dispute the hourly *partner* rates at both Curtin and Brinkmann. The legal assistant/paralegals' rate did not change, at either firm, during the pendency of this action.

Schubert, Mr. Cunningham worked for thirteen years at the defense firm of Marshal, Dennehy, Warner, Coleman & Goggin, P.C. At both of these previous firms, he was involved with, and at times directly responsible for, the legal billing submitted by attorneys. His responsibilities included deciding the appropriate rates to bill in defense cases. Mr. Cunningham states that he is knowledgeable concerning the billing rates in insurance (bad faith) defense cases. Mr. Cunningham also reviewed and is familiar with the legal invoices prepared by both the Curtin and Brinkmann firms in this case. He states that the invoiced rates are within the prevailing market rates in the community. In summary, he says that both firms, Curtin and Brinkman, have charged rates in this case that are "standard and reasonable" in bad faith actions. (Doc. No. 69, Ex. D.)

For the reasons previously stated, the court finds that the relevant community includes the geographical locale of all lawyers who were involved in this case, and that the rates charged by both the Curtin and Brinkman firms, for partner time, were reasonable and standard. Additionally, although not challenged by the plaintiffs, the court also finds that the associate and legal assistant rates charged are also reasonable and standard.

## II. REASONABLENESS OF HOURS EXPENDED BY CURTIN AND BRINKMANN

■ "The next step in the lodestar calculation is determination of the time reasonably expended in conducting the litigation." *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933. A (party) requesting attorney fees must provide evidence supporting the time claimed. *Id.* The district court should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are "excessive, redundant, or otherwise unnec-

essary." *Id.* at 433–34, 103 S.Ct. 1933. *Public Interest Research Group of New Jersey v. Windall,* 51 F.3d 1179, 1188 (3d Cir.1995).

■ This court "has a positive and affirmative function in the fee fixing process, not merely a passive role." *Loughner v. University of Pittsburgh,* 260 F.3d 173, 178 (3d Cir.2001). As such, the court has spent extensive time both in the hearing on this matter and reviewing, independently, *line-by-line,* the bills submitted by Curtin and Brinkman.

It is noteworthy that the original itemization of costs submitted by the defendant Allstate merely contained a categorization of the total fees charged on each invoice. (Doc. No. 64). This fell woefully short of the itemization and specificity required to allow a court to determine the reasonableness of claimed hours and rates. Also astonishingly, in an affidavit submitted by the defendant Allstate, the managing partner of the Curtin firm stated "Due to the apparent likelihood that this case will be appealed, defendant Allstate *is unwilling to produce bills including narratives* as information is protected by attorney client privilege and by attorney work product." (Emphasis added) (Doc. No. 69, Ex. C, ¶ 18). It appeared that the Curtin firm expected the court to rubber stamp the unsubstantiated time breakdown set forth in ¶ 19 of the managing partner's affidavit. This breakdown merely listed the firm's 378.5 hours into six (6) categories. (i.e. pleadings, discovery, pretrial and trial preparation, trial, post trial, miscellaneous). This lack of specificity, would have deprived the court of *any* basis for determining the reasonableness or accuracy of many charges. See *Loughner, Id.* at 179. This, of course, was completely unacceptable and may have justified the courts complete denial of fees.

However, the court, *sua sponte,* held a telephone conference with the attorneys for both sides and informed them that the submission by Allstate (Doc. No. 64) was insufficient. As a result of that conference call, Allstate submitted a more comprehensive and appropriate itemization of expenses and attorney's fees which included computer generated dates of service, indications of the attorney who performed the services, a general description of the services, the hours worked, the rate charged and the total amount billed. (Doc. No. 77) A copy of this document was served upon the plaintiffs' counsel, thereby enabling them to make rational arguments and challenge entries for which the defendant claimed entitlement to reimbursement of fees.

When Allstate filed and served its more specific itemization of costs, it was in redacted form. (Doc. No. 77). Allstate did not supply the court with an unredacted copy so that the court could review the allegedly privileged entries and make determinations as to the appropriateness of the time or rate billed. At the hearing, the court requested and received a copy of the unredacted itemization of costs. However, even the "unredacted" itemization of costs did not "unredact" *all* entries. As such, those entries that have not been supplied to the court and are the subject of objection by the plaintiff, will be disallowed. This review by the court, in all other respects, has been undertaken using that unredacted itemization supplied to it at the hearing.

Unfortunately, that itemization of expenses and attorney's fees came with a privilege log that excluded, entirely or in part, over 100 descriptions of services. Virtually all of the redactions were claimed to be "material (that) relates to a party's mental impressions, conclusions or opinion relating to strategy." These "privileged" redactions will be discussed in more detail later in this opinion.

The court has reviewed *line-by-line,* all of the entries by all partners, associates, legal assistants and investigators billing in this case. The court finds that the majority of listed items are reasonable and appropriate. However, based on the objections of plaintiffs' counsel, the argument at the hearing, and the court's independent review, it will make the following changes to the fee request.[7]

### The Curtin Firm

On the Curtin bill dated November 24, 1999, the court makes the following findings:

- On July 6, 8, 9, 22, 1999, Attorney Joel Steinman billed three (3) hours related to the removal of this action from state court to federal court. In addition, on July 12 and August 2, Attorney Stein billed .8 hours related to the same activity. The court finds that this expenditure of hours for a rather simple process of filing a notice together with an attachment, normally the complaint, is excessive. As such, the court will reduce Attorney Steinman's billed time from 3.0 hours to 1.0 hours and Attorney Stein's from .8 to .4;

- On August 26, 1999, there appears to be a double billed entry relating to review of correspondence from the plaintiffs' attorney concerning with-

7. The court has specifically reviewed each one of the objections made by the plaintiffs' attorney at oral argument. In this regard, the court will not go over each of the items it is finding *reasonable,* as that would require the court to virtually write a statement concerning every billable entry by Curtin and Brinkman. Rather, the court, after having reviewed all of the entries, will identify those entries which must be reduced based upon the rate that was charged or the hours that were expended.

drawal of Counts II, III and IV. Attorney Stein is listed as billing the same entry twice at .2 hours each time. The duplicative entry will be deleted and one bill of .2 hours will be allowed;

- On August 26 and 27, 1999, Attorney Steinman billed a total of 4.6 hours to draft an answer, affirmative defenses and a counterclaim to the complaint. After review of the documents, the court finds this time excessive and will reduce it to 2.0 hours.

On the Curtin bill dated July 26, 2000, the court makes the following findings:

- On October 29, 1999, Attorney Stein billed .3 hours to read a two page court scheduling order. The court reduces that entry to .1 hours;
- Between January 3 and February 21, Attorney Steinman spent 10.1 hours and Attorney Stein spent 16.3 hours in matters related to drafting, sending and receiving interrogatories and demands to produce. This included an 8.8 hour billing by Attorney Stein on February 16 for review of documents for a privilege log after Attorney Steinman had spent 3.5 hours on February 10, reviewing the file for privileged information and preparing a draft privilege log. The court finds these time entries excessive and will reduce Mr. Steinman's time from 10.1 hours to 5.0 hours and Ms. Steins from 16.3 to 8.0 hours;
- On February 29, 2000, Attorney Stein billed 1.4 hours drafting 7 letters to witnesses advising them of the possibility of a deposition. The court finds this excessive since these letters are relatively standard notices. The billings will be reduced from 1.4 hours to .5 hours.

On the Curtin bill dated November 2, 2000, the court makes the following findings:

- On April 12, 2000, Attorney Steinman billed .2 hours for a telephone conference with the Brinkman firm concerning instructions on Bate stamping their file. Because the Curtin firm later also billed for Bate stamping the file, the court is disallowing this item. As such, the .2 hours will be eliminated;
- On May 12, 2000, Attorney Allan D. Goulding billed .7 hours to review the examination under oath of Mrs. Valenti to determine if she needed to be deposed. Two days earlier, Attorney Steinman analyzed the same examination under oath to determine whether Mrs. Valenti needed to be deposed. As such, the court finds these billings to be duplicative and will eliminate Mr. Goulding's .7 hours;
- On May 18, 2000, Attorney Steinman billed .2 hours to review an affidavit of Frank Hodle repudiating his prior statement and similarly read an affidavit of Howard Perrego, repudiating his prior statement. One week later on May 25, 2000, Attorney Goulding reviewed the same statements and billed an additional .5 hours. Because the court finds these billings duplicative, it will eliminate Attorney Goulding's .5 hour billing entry on May 25, 2000;
- Also on May 25, 2000, Attorney Steinman billed .2 hours for a telephone call to the investigator concerning the affidavits of Mr. Hodle and Mr. Perrego. He later billed .8 hours to analyze the investigative materials to contrast the affidavits with prior discovery material. This same review was apparently done by

Attorney Goulding on the same day. Attorney Goulding billed 1.5 hours. As a result of the duplication, the court will eliminate the .2 hour and .8 billing of Attorney Steinman;

- On August 3, 2000, Attorney Goulding billed 1.2 hours to review the status of all discovery completed and outstanding to determine whether additional action was necessary. The court will eliminate this 1.2 hour billing in light of the extensive and exhaustive billing on discovery that had already taken place on this file.

▪ On the Curtin bill dated February 23, 2001, the court makes the following findings:

- On October 9, 2000, Attorney Goulding billed 5.0 hours at $150.00 per hour to prepare trial exhibits by marking and numbering each exhibit, making copies for opposing counsel and preparing a list of exhibits and witnesses for trial. The court believes that this time should more properly be billed as legal assistant time and not as attorney/partner time. As such, the court will allow the 5.0 hours, but will reduce the rate to $65.00 per hour, the legal assistant rate at Curtin at that time.

▪ On the Curtin bill dated November 8, 2001, the court makes the following findings:

- On September 5, 2001, Attorney Stein billed. 2 hours for a telephone conference with a new adjustor concerning the status of the case. She also billed .1 hours reading an e-mail from that same adjustor advising that he was taking over the case. The court does not see how this is reasonably related to the defense of the action; rather, it is an administrative matter between Allstate and its counsel, it should not be billed to

the plaintiff. As such, the .3 hours is excluded.

▪ On the Curtin bill dated February 4, 2002, the court makes the following findings:

- On November 12, 2001, Attorney Stein billed 5.2 hours for trial preparation. That trial preparation was described in the court's unredacted itemization as "witness subpoenas and inconsistent statement." Review of the inconsistent statements was previously done by Attorney Goulding and Attorney Steinman. Additionally, Attorney Stein billed .6 hours to prepare "correspondence/trial notice" to witnesses. The following day, November 13th, Attorney Stein billed 1.3 hours for the preparation of subpoenas for trial for eleven (11) witnesses. On November 14th, Attorney Stein billed .9 hours to prepare correspondence concerning the trial subpoenas. It appears to the court that this total billing of 8 hours related almost entirely to preparation of notices and correspondence notifying witnesses of trial is excessive. The court will therefore reduce the hours listed to 2 hours;

- On November 14, 2001, a fourth attorney, Robert G. LaBar, became involved with the case. Attorney LaBar apparently needed to come up to speed on the case, however, he billed a total 26.5 hours on November 14th, 19th, 20th, 27th, 28th, December 3rd, 4th, 6th, 9th and 10th, all as trial preparation. There is no further description of what the trial preparation actually consisted of. The court is unable to make a determination of whether or not the time spent by Attorney LaBar was required, or duplicative of time already spent on trial preparation by Attorneys Stein,

Steinman and Goulding. However, unlike Attorney's Steinman and Goulding, Attorney LaBar actually presented witnesses and participated in the trial. It was reasonable to expect he would bill some time preparing for the trial. As such, the court will reduce the 26.5 unexplained trial preparation hours billed by Attorney LaBar to 15 hours;

- On November 16, 2001, Attorney Stein billed .5 hours for a teleconference with Attorney Jack Brinkman, however, Allstate has failed to supply the court with the "unredacted" information describing the reason for the conversation. Therefore, the court is unable to make a determination of whether or not that time is reasonable. As such, it will be excluded;

- On November 20, 2001, Attorney La-Bar billed 1.5 hours for attending a pretrial conference with opposing counsel. Attorney Stein also billed 1.5 hours that same day for the same conference with plaintiffs' counsel. The court does not believe that both lawyers were necessary at the conference and therefore will exclude the 1.5 hours billed by Attorney La-Bar;

- On November 29, 2001, Attorney Stein billed 7.2 hours to attend the final pretrial conference and Attorney LaBar billed 8.2 hours to attend the final pretrial conference. While counsel may determine that they would like to have both lawyers present at the final pretrial conference, the court is unaware of any reason why it was *necessary* to have both lawyers present. It does not believe the billing for both attorneys should be charged to the plaintiffs. As such, the 8.2 hours billed by Attorney LaBar will be excluded;

- On December 5, 2001, Attorney Stein also billed .3 hours to tell Attorney Brinkman that he was not needed as a witness. This billing appears excessive and will be reduced to .1;

- On December 10, 2001, Attorney La-Bar billed 4.0 hours to attend the trial. The trial of this matter did not begin until December 11, 2001 and therefore the 4.0 hours listed to attend trial on that date will be excluded;

- On December 11, 2001, Attorney La-Bar billed 3.5 hours to attend jury selection. Attorney Stein also billed 6.0 hours for appearance at trial and jury selection. While the court has allowed billing by both attorneys at trial on days when both attorneys actually had involvement in the presentation or preparation of witnesses, it does not appear that this case required two attorneys billing for selection of the jury. Attorney LaBar's billing of 3.5 hours will be eliminated;

- On December 20, 2001, Attorney Stein billed .4 hours for a telephone call in which she discussed the trial with Attorney Brinkman. The court does not believe this time should be billed to the plaintiff and therefore the time will be excluded.

It should be noted that the court has reviewed *all* of the Curtin firms' billings. It has reduced and/or excluded the billings noted above. On all of the days that billings were excluded, there were many additional billings which the court has found to be reasonable. In fact, there are literally hundreds of billings which the court has not disturbed and found reasonable in this case.

Based upon this review, the court will reduce the Curtin firm's bill as follows:

Attorney Stein's billing will be reduced as follows:

- Attorney Stein's hours billed at $135.00 per hour will be reduced by 9.1 hours for a total reduction of $1,228.50;
- Attorney Stein's hours billed at $150.00 per hour will be reduced by 10.4 hours for a reduction of $1,560.00;
- In total, the billings for Attorney Stein will be reduced by $2,788.50.

Attorney Steinman's billing will be reduced as follows:

- Attorney Steinman's hours billed at $120.00 per hour will be reduced by 10.6 hours for a total reduction of $1,272.00;
- Attorney Steinman's hours billed at $135.00 per hour will be reduced by 1.2 hours for a total reduction of $162.00.
- In total, the billing for Attorney Steinman will be reduced by $1,434.00.

Attorney Goulding's billing will be reduced as follows:

- Attorney Goulding's hours billed at $150.00 per hour will be reduced by 2.4 hours for a total reduction of $360.00;
- an additional reduction of 5.0 hours from $150.00 per hour to $65.00 per hour.
- In total, the billing for Attorney Goulding will be reduced by $785.00.

Attorney LaBar's billing will be reduced as follows:

- Attorney LaBar's hours billed at $140.00 per hour will be reduced by 25.2 hours for a total reduction of $3,528.00.

In total, the Curtin bill will be reduced by $7,365.50 from $56, 520.77 to a total allowable billable amount of $49,155.27.

### The Brinkmann Firm

On the Brinkmann bill dated March 26, 1999, the court makes the following findings:

- On February 4, 1999, Attorney Brinkmann billed .6 hours for a letter. However, the subject matter is redacted on the court's copy. Since the court can not tell whether the billing was necessary, the billing will be disallowed;
- Similarly, on March 3, 1999, Attorney Brinkmann billed .2 hours for an entry concerning a telephone call. However, the subject matter is redacted on the court's copy. For the reason's stated above, the billing will be disallowed;
- Attorney Brinkmann billed 17.4 hours on February 9th, 10th, 11th, 25th, and March 2nd, 3rd, 4th, 5th and 17th relating to the statements under oath to be taken from Mr. and Mrs. Valenti. The court has reviewed each of those entries and finds they are excessive for the stated activity. As such, the court will reduce the 17.4 hours to 10 hours.

On the Brinkmann bill dated August 30, 1999, the court makes the following findings:

- On April 1st, 6th and May 27th, 28th and June 1st, Attorney Brinkmann billed 17.2 hours relating to the review and digesting of the examinations under oath of the Valentis. The court finds this time to be excessive and will reduce those billings to 10 hours;
- Similarly, on June 21st, 22nd, 23rd, 24th, 28th and 29th, Attorney Brinkmann billed 29.6 hours for work on an opinion letter. During the same time frame, on June 25th, 26th and 27th, Attorney Susan M. Danielski

billed 4.0 hours on the same opinion letter. Mr. Brinkmann billed at $125.00 per hour; Ms. Danielski billed at $110.00 per hour. The court will allow a total of 20 hours billing at Mr. Brinkman's rate of $125.00 per hour for the opinion letter. It will exclude the 4.0 hours billed by Attorney Danielski as duplicative and excessive.

On the Brinkmann bill dated November 2, 2000, the court makes the following findings:

- On April 10th, 11th and 12th, Attorney Brinkmann billed 2.3 hours at $125.00 per hour for reviewing, copying and Bate stamping his file for the Curtin firm. The court will allow the time, however, it will be billed at $50.00 per hour, which was the legal assistant rate at the Brinkman firm during this time.

Based upon this review, the court will reduce the Brinkmann firm's bill as follows:

Attorney Brinkmann's billing will be reduced as follows:

- Attorney Brinkman's hours billed at $125.00 per hour, will be reduced by 20.8 hours for a total reduction of $3,625.00;
- An additional reduction of 2.3 hours from $125.00 per hour to $50.00 hours.
- In total, the billing for Attorney Brinkmann will be reduced by $3,797.50;

Attorney Danielski's hours will be reduced as follows:

- Attorney Danielski's hours billed at $110.00 per hour will be reduced by 4.0 hours for a total reduction of $440.00.

In total, the Brinkmann bill will be reduced by $4,237.50, from $11,582.60 to a total allowable billing of $7,345.10.

## III. TRAVEL TIME AND EXPENSES

The plaintiffs next challenge the reasonableness of the travel time charged by Curtin and Cloud during the course of the investigation and trial of this matter. This argument is similar in all respects to the plaintiffs' argument that the defendant should have chosen counsel and an investigator in the northeast portion of the state. Once again plaintiffs allege such a selection would have resulted in lower attorneys' fees and travel costs. Because the court finds that selection of counsel and the investigator were from the relevant community, and their expertise was an important factor in these selections by Allstate, the court concludes that their travel expenses are allowable, as long as they were not unreasonable, excessive or unnecessary.

According to *Black's Law Dictionary* and *Webster's Third New International Dictionary:*

*Unreasonable* is defined as "Not guided by reason; irrational or capricious." (*Black's Law Dictionary,* 1543 (7th Ed.1999));

*Excessive* is defined as "Exceeding the usual, proper or normal." (*Webster's Third New International Dictionary* 792 (1981));

*Unnecessary* is defined as "Not required under the circumstances; not necessary." (*Black's Law Dictionary* 1537 (7th Ed.1999)).

None of the above definitions, in any way, apply to the facts and circumstances before this court. After a fact intensive review of the records and arguments by counsel, the court is completely satisfied that the rather modest travel expenses and time associated with this case, are in all instances reasonable.

The court has also reviewed the billable hours associated with this travel time.

The law with respect to compensation during travel time is unsettled. Some courts have allowed the normal attorney billing rate during travel time, generally based upon the theory that the travel is directly related to the representation of the client, necessary to that representation and additionally is a lost opportunity with respect to working on other matters. See *e.g.* *Rush v. Scott Specialty Gases, Inc.,* 934 F.Supp. 152, 156 (E.D.Pa.1996). Other courts have found that, while counsel may be compensated for travel time, it should be at less than their normal hourly rate. See *e.g. Rank v. Balshy,* 590 F.Supp. 787, 796–7 (M.D.Pa.1984)(reduction in the regularly hourly rate of billing by twenty-five percent (25%) for travel time).

While the Third Circuit has addressed the generalities and in some cases specifics of attorney's fees and expenses, it "has declined, and will continue to decline, the flood of invitations to interject itself into the minutiae underlying such judgments." *Danny Kresky Enterprises Corp. v. Magid,* 716 F.2d 215, 216–217 (1983). In *Kresky,* the district court eliminated 46 of the 56.3 hours of travel time. In reversing, the circuit court rejected the district court's reasoning that plaintiff was aware that the case would be tried in Pittsburgh, yet hired Philadelphia counsel, and knew there were "capable attorneys" present in Pittsburgh who could handle the case. The Third Circuit found that "plaintiff's counsel was from the same state, not from across the country and under Pennsylvania rules is free to practice throughout the state." Further, the court found that selection of counsel was undoubtedly and reasonably influenced by his involvement in similar litigation and therefore would allow him to be thoroughly familiar with many important facts about the industry. *Id.* at 218. This is precisely the facts that we see here. The selection of experienced counsel and an experienced investigator from the southeast portion of the state, as stated by the court earlier, was reasonable and appropriate under all the circumstances.

At the hearing, Attorney Stein argued that the Curtin firm was extremely prudent in travel, conducting virtually all conferences by telephone and only traveling when required by court or at the convenience of all parties. The court has reviewed the Curtin bill from June 1999 through December 31, 2001 and finds only two entries related to travel expenses. On the Curtin bill dated February 4, 2002 are hotel accommodations of $729.42 and parking of $19.25. It appears that these expenses are for lodging during the trial in Wilkes–Barre. The fact that the total travel expenses for Curtin are $748.67 out of a total bill of $56,520.77 speaks for itself. It appears that the Curtin firm, as urged by Attorney Stein, was judicious and, in fact, penny pinching in expending money for travel. In no way does the court find that this expenditure, which is less than 1½ % percent of the total bill, unreasonable, excessive or unnecessary.

Similarly, both Allstate and the Curtin firm indicated that they had used Mr. Cloud on arson investigations in the past. Mr. Cloud is a former Pennsylvania State Trooper experienced in arson investigations. The Allstate adjustor advised that she had used Mr. Cloud in the past and presently is using him on other matters. The Curtin firm also indicated that it agreed with the determination to use Mr. Cloud in light of his experience in this particular area of investigation.

Between February 16, 1999 and December 13, 2001, Cloud billed for eighteen (18) trips to and from southeast and northeast Pennsylvania, for the purposes of identifying witnesses, service of process, service of subpoenas, gathering background information, photography, locating and interviewing witnesses, testimony at trial and other

generally accepted reasonable and standard investigative activities. These eighteen (18) trips occurred over the course of a little less than three (3) years, or approximately six (6) trips per year. In light of the circumstances of this particular case, and the expertise of Mr. Cloud, it was not unreasonable for the defendant to have selected him, as Allstate and Curtin were familiar with him, had used him in the past, and were confident of his abilities. Based upon the jury's verdict in this case, it appears that Allstate made a reasonably prudent selection.

The trips mentioned above occurred on the February 16th and 24th of 1999, March 3rd, 11th, 14th and 15th of 1999, April 21st and 30th of 1999, June 23, 1999, June 13th and 16th, 2000, November 26th and 27th of 2001, December 6th, 11th, 12th (two trips) and 13th of 2001. (Trial of this matter occurred on December 11th, 12th, and 13th.)

In reviewing the billings however, it appears that Cloud, in one instance, has billed twice for the same trip. The Cloud bill of December 7, 2001 shows a trip of 310 miles billed at .40 a mile and tolls of $6.40 for a total billing of $130.40. The next bill sent out by Cloud is dated January 2, 2001 also has listed a December 6th trip of 310 miles at .40 a mile with tolls of $6.40. Since it appears that this is a duplicative billing, the billing from the December 7th invoice will be excluded.

The court has reviewed the tolls that were paid and the lodging expense by Cloud which was billed on December 13, 2001. In all respects, the travel expenses by Cloud, with the exclusion of the duplicative bill for the December 7, 2001 trip, appear reasonable and standard.

The Cloud travel expenses will be reduced by $130.40 in light of the apparent duplicative billing for the December 6, 2001 entry.

### Plaintiffs' General Objections to All Redacted Entries in Defendant's Invoices

As noted above, the defendant initially supplied an inadequate and unsubstantiated time breakdown categorizing the billing into Investigative Costs, Pre and Post Suit; and Attorneys' Fees, Pre and Post Suit. (Doc. No. 64). Thereafter, and again inadequately, the defendant supplied a slightly more particularized breakdown of the hours spent by the Curtin firm divided into six (6) categories; pleadings, discovery, pretrial and trial preparation, trial, post trial, and miscellaneous. (Doc. No. 69, Exh. C, ¶ 19). Finally, on March 26, 2002, Allstate provided more particularized billing statements of Curtin, Brinkmann and Cloud, together with a fourteen (14) page, one hundred and seven (107) item privilege log which purported to redact privileged descriptions of the billable activity of counsel.

 The attorney-client privilege is one of the oldest recognized privileges for confidential communications. *Swidler & Berlin v. United States*, 524 U.S. 399, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998)(citing *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *Hunt v. Blackburn*, 128 U.S. 464, 9 S.Ct. 125, 32 L.Ed. 488 (1888)). The privilege is intended to encourage full and frank communications between attorneys and their clients and therefore promote broader public interests in the observance of law and the administration of justice. *Upjohn, supra* at 389, 101 S.Ct. 677; *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). However, any invocation of the attorney-client privilege should not go unexamined "when it is shown that the interest of the administration of justice can only be frustrated by its exercise." *Swidler & Berlin, supra* at 412, 118 S.Ct. 2081 (citing *Cohen v. Jenkintown Cab Co.*, 238 Pa.Super. 456, 464, 357 A.2d

689. 693–694 (1976)). Because of the right to every man's evidence, any such invocation of the privilege must "be strictly construed." *University of Pennsylvania v. EEOC*, 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990)(citing *Trammel v. United States*, 445 U.S. 40, 50, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)).

The attorney-client privilege does not automatically extend to a peripheral fact regarding an attorney-client communication or the attorney-client relationship in general. The general nature of the privileged matter, the occasion and circumstances of any communications, actual circumstances of the attorney-client relationship remain discoverable, even when the underlying communication itself may be privileged. *Stabilus v. Haynsworth, Baldwin, Johnson and Greaves, P.A.*, 144 F.R.D. 258, 268 (E.D.Pa.1992). "The attorney-client privilege only precludes disclosures of communications between attorney and client and does not protect against disclosures of the facts underlying the communication." In general, the facts of legal consultation or employment, client identities, *attorney's fees* and the scope and nature of employment are not deemed privileged. *Humphreys v. Donovan*, 755 F.2d 1211, 1219 (6th Cir.1985)(emphasis added).

Generally speaking, the Work Product Doctrine has been codified in discovery cases and protects the unwarranted inquiries into the files and mental impressions of an attorney. See e.g., *Hickman v. Taylor*, 329 U.S. 495, 510, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In federal courts however, where the federal common law privilege applies, the burden of proof is on the proponent of the Work Product Doctrine. *Logan v. Commercial Union Insurance Co.*, 96 F.3d 971, 976 (7th Cir.1996). Any privileges must be weighed against the burden upon the party requesting attorney's fees to set forth, with specificity, the

information which supports the fees that they are entitled to.

The court in this case has great concern with the defendant's liberal use of purported privilege to protect what can only be described as mundane and uninforming entries in their billing records. This use of purported "privilege" has greatly multiplied the work this court has had to undertake since the opposing party could not address any of the particulars that have been redacted from the billing statement presented to the plaintiffs' counsel. As random examples of "privileged" information, selected from the billing, the defendant on July 13, 1999 *redacted* an itemization for Attorney Stein that reads "telephone conference with Jack Brinkman". Nothing in the description describes the contents of the conversation, but merely that a phone call between one lawyer and another took place. It is hard to understand what privileged information would be disclosed by leaving that description unredacted.

Interestingly enough, in the Brinkmann bill on the same date, the defendant left *unredacted* "telephone conference with B. Stein, Esquire . . ." Yet, in the Curtin bill on April 3rd, an *unredacted* billing description by the Curtin firm states "telephone conference with J. Brinkmann . . ." On the Curtin's November 16, 2001 billing description is "telephone conference with witness Jack Brinkman. . ." On December 20, 2001, the Curtin firm's billing shows "telephone from Attorney Brinkmann to discuss trial".

The court fails to see why a telephone conference with Mr. Brinkmann on July 13, 1999 is privileged and redacted, yet the same entry is not privileged and left unredacted on April 3, 2000, November 16, 2001 and, December 20, 2001.

On June 30, 1999, the Curtin billing statement of Attorney Stein indicates that

she "read correspondence from Jack Brinkman Re: File". Similarly, on July 8th, Ms. Stein left unredacted that she "read correspondence from Brinkmann to Allstate representative Nancy Rosen." On July 8th, a second entry from Attorney Stein states "read correspondence from Jack Brinkmann." On July 12th, a billing entry states "read correspondence from Brinkmann Re: Video"; again on the 12th, another billing entry indicates "read correspondence from Brinkmann Re: correspondence from Nardone." On July 13th, a billing entry left unredacted reads "Read correspondence between Brinkmann and plaintiff".

Other interesting redactions include Curtin's July 22, 1999 billing description of a "telephone conference with Nancy Rosen Re: Strategy." "Strategy" was the only word redacted. It strikes the court that this is a very general description and would not in any way identify the specifics of a correspondence. The court would assume that every discussion with Ms. Rosen, the chief Allstate claims representative would concern, among other things, "strategy".

The December 7, 1999 billing statement of Curtin includes "revised interrogatories to plaintiff to add expert interrogatories within standard set." The words "within standard set" were redacted. It's hard for the court to understand what mental impression or opinion relating to strategy the redaction of the words "within standard set" promoted.

On the February 18, 2000 billing entry are the words "draft correspondence to N. Rosen returning original file materials." The words "returning original files materials" were redacted. Again, the court is hard pressed to understand why that information was of such an important nature that it required redaction and inclusion in a privilege log. Similarly, on February 23, 2000, the billing description is telephone conference with Nancy Rosen Re: file delivery. The words "file delivery" were redacted. How this affects the mental impressions, conclusions or opinions related to strategy in this case are completely unimaginable to this court.

In the meantime, each of these 107 redactions required individual review since plaintiff's counsel, did not have the opportunity to forego a challenge to them by simply being informed of these clearly non-privileged and rather unimpressive, rote descriptive entries. This misuse of a privilege log continues with entries such as the July 10, 2000 entry "prepare correspondence to N. Rosen enclosing Cloud report of June 29, 2000 with summary of same." The words "with summary of same" were redacted from the billing entry. In this entry, the Curtin firm has disclosed information that a correspondence with Nancy Rosen occurred; that they enclosed the report of Thomas Cloud, and even supplied the date of that report, June 29, 2000. Yet, they deemed it important to redact as "privileged" that they placed a "summary of same" in the correspondence as well. What additional information, inappropriate entry into the strategy and mental impressions of the Curtin firm's minds could possibly be gleaned by the fact that they supplied a "summary" along with the report?

Similar entries, such as the redacted August 3, 2000 description "Analyze strategy in light of affidavits" hardly gives opposing counsel an entry into truly privileged communications, work product, mental impressions, conclusions, opinions or strategy of counsel. On August 25, 2000, the billing statement indicates "telephone conference with Nancy Rosen Re: pre-trial conference date and trial date." The words "pre-trial conference date and trial date" have been redacted. Again, the court is hard pressed to think of *any*

**220**

conceivable impression, conclusion or opinion relating to strategy that would prohibit this entry from being disclosed. Unfortunately, the redacted descriptions are replete with such rote, standard and generally unprivileged entries.

The Brinkmann firm redactions are no less perplexing. Without belaboring the point, there are thirteen (13) descriptions in the Brinkmann billing that report a telephone conference, identify the parties to that telephone conference, but redact the subject matter when it is only described as "status", "status of investigation" or "results of investigation". Nowhere in those descriptions does it describe *what* the status is, the attorney's opinions, mental impressions, or strategies relating to that status. Redactions of this nature, under the guise of "privilege" are not only perplexing, but costly, inefficient and time consuming for the court to review.

Counsel is reminded that privilege is a shield not a sword. It should be used to protect "privileged" matter, not to deny opposing counsel relevant and pertinent evidence. Counsel should also remember that Allstate, as the proponent of a motion for attorney's fees, has a burden and responsibility of fairness, accuracy and openness unless there is a *genuine* issue of privilege.

 Frankly, based upon the privilege log that has been submitted to the court in this attorney fee matter, the court has great concern about the misuse of privilege logs to deny reasonable, relevant and probative evidence to the adversary. Since the plaintiff has not objected to the time spent in review and preparation of the discovery privilege log [8], the court cannot "decrease a fee award based on factors not raised at all by the adverse party." *Bell v. United Princeton Prop., Inc.*, 884 F.2d 713 (3d Cir.1989).

In light of the foregoing and, as stated by the court previously, some of the redacted information has never been supplied to the court. Those entries, as described above, have been excluded.

For all of the reasons stated above, and pursuant to the provisions of 18 Pa.C.S.A. § 4117(g), the court awards reasonable investigative expenses, costs of suit and attorney's fees to the defendant as the prevailing party in the insurance fraud claim. The total bill of $83,900.85 is reduced by $11, 733.40 for the reasons stated herein, leaving a total recoverable amount of $72,167.45. The plaintiff, Anthony Valenti, is therefore directed to pay $72,167.45 to the Allstate Insurance Co. as a result of the jury's finding that he engaged in insurance fraud pursuant to the provisions of 18 Pa.C.S.A. § 4117.

### ORDER

The Judgment originally entered in this case was on December 13, 2001. By order of Court dated January 11, 2002, that judgment was held in abeyance until all post trial motions were resolved. (Doc. No. 62). All pending matters in this action have been resolved. Therefore, judgment is entered for the defendant. The Clerk of Court is directed to close this case.

---

**8.** Over 21 hours can be directly associated with this process according to the Curtin billing statements.